# ROBERT BARTLETT EXPERT REPORT

Lachney v. Target

June 25, 2008

Expert Report by Robert Bartlett

<u>My relevant qualifications and experience to provide expert testimony</u>

I have a BS degree in physics and electronics from the University of Wales (1966). I was Partner in Charge of Retail Consulting for Touche Ross & Co., a multinational accounting and consulting firm (1971-1986). I was Partner in Charge, Retail Management Consulting for Coopers & Lybrand (1990-1992). I have served on the Board of Advisors of the Retail Management Institute at the University of Santa Clara for fifteen years and am a past President of the Western Retail Financial Executives division of the National Retail Federation. An updated copy of my curriculum vitae is attached to this report. My qualifications and experience include:

- I am an independent career management consultant to the retailing industry. I have provided consulting services for two hundred companies over the years, large and small. A partial list of these companies is included in my statement of qualifications and on my professional web site bjaretailconsultants.com.
- I have assisted in many start-ups including Ross Stores, Williams Sonoma, Bare Escentuals, Gymboree and Pacific Sunwear. That work included concept development, start-up operations, and organizational development.
- I have served on a number of public and private company Boards including Office Depot, Esprit, Bare Escentuals and Rainbow Records. The role of a Board member is to make sure that the management team is protecting the investor's interests.
- I have assisted numerous retail and vendor companies with bankruptcy reorganization including Carter Hawley Hale (Emporium) and Jay Jacobs.
- I have a broad and deep understanding of all of the business processes that retailers must implement, including real estate, store operations, information systems, credit, merchandising, purchase order management, supply chain management and marketing.
- I am an expert in supply chain management and am frequently asked to assist in writing position descriptions and providing management coaching for merchants, planners and buyers.
- I am an expert in field management and store operations and am frequently asked to assist in writing position descriptions and providing management coaching for field executives and store managers.
- I have previously provided expert testimony in matters relating to vendor terms and purchase order management, store operations and compensation practices.

EXHIBIT 9

- I have consulted for many general merchandise retailers including Mervyn's, Ross Stores, JC Penny, Wal*Mart, Sears, and Macy's.
- I have run seminars for independent retailers on how to start and grow a retail business.
- I have been a General Partner in a venture capital fund, Terranomics Ventures, raised to invest in specialty retailing companies.
- I have started a number of retail businesses myself using venture capital, including Well-Pet (now Petco) and Imaginarium, and others which are now defunct.
- I have participated in workshops and industry studies with the National Retail Federation in developing strategies and standards for merchandise marking, EDI, purchase order management and vendor partnership.
- My current clients include Signet, the largest jewelry retailer in the world and Comercial Mexicana, a large general merchandise retailer in Mexico City.

My expert opinions in this matter are based upon 30 years of hands-on retail industry business management consulting experience rather than academic study. A critical aspect of my retail management consulting practice is a broad and deep understanding of the business patterns and practices that successful retailers employ to compete in the global marketplace.

Facts and Data Considered in Preparing This Report

1. Plaintiff's combined response to defendant's motion to "de-certify" and defendant's objection to certification of a class,
2. Order dated March 16, 2007 issued by Joe Heaton, United States District Judge, Western District of Oklahoma,
3. Deposition of Carmen Moch taken on behalf of plaintiff,
4. Deposition of Carolyn Carr produced as a witness at the instance of the plaintiff,
5. Deposition of Norval Eugene Cole taken on behalf of plaintiff,
6. Deposition of Jessica Adkins taken by attorney for defendant,
7. Deposition of Judith Anderson taken on behalf of defendant,
8. Deposition of Linda Bizzell taken on behalf of defendant,
9. Deposition of Deborah Buttram taken on behalf of defendant,
10. Deposition of Cindy Sioux taken on behalf of defendant,
11. Deposition of Jennifer Dasczynski taken on behalf of defendant,
12. Deposition of Pauline Denton taken on behalf of defendant,
13. Deposition of Callie Fincher taken on behalf of defendant,
14. Deposition of Tahereh Ghanbari taken on behalf of defendant,
15. Deposition of Maria Hernandez taken on behalf of defendant,
16. Deposition of Erika Huff taken on behalf of defendant,
17. Deposition of Constance Kai taken on behalf of defendant,
18. Deposition of Charlette Lachney taken on behalf of defendant,
19. Deposition of Delia Lopez taken on behalf of defendant,
20. Deposition of Milton Marcus taken on behalf of defendant,
21. Deposition of Phyllis Masek taken on behalf of defendant,
22. Deposition of Steven Middleton taken on behalf of defendant,
23. Deposition of Carole Murphy taken on behalf of defendant,
24. Deposition of Debra Ogden taken on behalf of defendant,
25. Deposition of Kathy Raglin taken on behalf of defendant,

26. Deposition of Ethel Robinson taken on behalf of defendant,
27. Deposition of Tet Fields taken on behalf of defendant,
28. Deposition of Sharon Tucker taken on behalf of defendant,
29. Deposition of William Wray taken on behalf of defendant,
30. Deposition of Martin Alberto Anchondo taken on behalf of defendant,
31. Deposition of Martha Berthelot taken on behalf of defendant,
32. Deposition of Hanna Brue taken on behalf of defendant,
33. Deposition of Gloria Bunton-Canniff taken on behalf of defendant,
34. Deposition of Pheryl Clarence taken on behalf of defendant,
35. Deposition of Darren Denman taken on behalf of defendant,
36. Deposition of Elvira Dukes taken on behalf of defendant,
37. Deposition of Ellen Flesher taken on behalf of defendant,
38. Deposition of Eliza Henry taken on behalf of defendant,
39. Deposition of Callie Fincher taken on behalf of defendant,
40. Deposition of Mary Ann Hickes taken on behalf of defendant,
41. Deposition of Bessie Johnson taken on behalf of defendant,
42. Deposition of Crystal Kelly taken on behalf of defendant,
43. Deposition of George Leistman taken on behalf of defendant,
44. Deposition of Michael Mehran Maiahy taken on behalf of defendant,
45. Deposition of Carmen Marrufo taken on behalf of defendant,
46. Deposition of Jamal Merchant taken on behalf of defendant,
47. Deposition of Linda Morones taken on behalf of defendant,
48. Deposition of Ebrin "Sandy" Norris taken on behalf of defendant,
49. Deposition of Janet Pascal taken on behalf of defendant,
50. Deposition of Hoang Thi Reynolds taken on behalf of defendant,
51. Deposition of Buff Scott, Jr. taken on behalf of defendant,
52. Deposition of Osiris Thorman taken on behalf of defendant,
53. Deposition of Vicki Weilert taken on behalf of defendant,
54. Affidavit of Mike Irwin dated November 13, 2007,
55. Affidavit of Richard Thomas Carraher dated November 6, 2007,
56. Deposition of Deville Turner – cross-examination on behalf of plaintiff,
57. Defendant's motion for summary judgment, supporting brief and appendix – Steve Greshowak v. Target Corporation,
58. Plaintiff's response to defendant's motion for summary judgment - Steve Greshowak v. Target Corporation,
59. Motions, Pleadings and Filings from Mark E. Warpenburg v. Target Corporation,
60. Deposition of Mark E. Warpenburg,
61. "My Total Compensation" booklet from Target Corporation,
62. "My Total Compensation" booklet – Pension Choice Decision Guide from Target Corporation,
63. Target Executive Team Member Handbook,
64. Target.com website,
65. Target Corporation 2007 Annual Report,
66. BNET.com article "Why is Target So Cool – Target's marketing strategy," April 2. 2001,
67. BNET.com article "Target works its magic," April 2, 2001,
68. New York Times article "Can Target Thrive in Wal-Mart's Cross Hairs?" June 2, 2002,
69. Interbrand white paper by Larry Oakner "Managing your brand through your employees," April 2005,
3

70. HR Management article" The silver lining at Borders,"
71. Harvard Business School abstract "Target's Cheap Chic Strategy," August 16, 2004.

## Compensation

I am being paid $250 per hour for my time in this matter. My compensation is not dependent on any conclusions that I might offer with respect to this matter.

Testimony within the past four years

My principal profession is management consulting to the retailing industry. I have undertaken a number of litigation support engagements during the past four years, accounting for less than 20% of my professional fee revenues:

| Case | Court | Work performed | Year |
|---|---|---|---|
| Barbara Carver, Donald Spector and Catalyst Applied Technologies, Inc v. Hopgood, Calimafde, Kalil & Judlowe, LLP | Supreme Court of the State of New York County of New York | Testimony | 2005 |
| Suva Partners v. San Anselmo Shopping Center | Superior Court California County of Marin | Testimony, Deposition | 2006 |
| Batterman v. Cosmopolitan | Superior Court California County of Alameda | Testimony, Deposition | 2006 |
| Tom Spies v. Micheal Emley | Superior Court California County of Contra Costa | Testimony, Deposition | 2006 |
| Designs by Chad & Jake v. Babies R Us | US District Court for the Southern District of Florida, West Palm Beach Division | Testimony | 2006 |
| Pharmacie Nouvelle v. A&G Wilshire | Superior Court California County of Los Angeles | Testimony, Deposition, Trial | 2006 |
| The Sports Authority v. Alliance Financial Capital | District Court, Arapahoe County, Colorado | Testimony, Deposition | 2007 |
| ZT Group International v. Aopen | Superior Court of New Jersey, Hudson County | Testimony, Deposition | 2007 |
| Dennis McNamara v. Wal-Mart Canada Corporation | Supreme Court of Nova Scotia | Testimony | 2008 |
| Great White Bear, LLC v. Mervyn's LLC | United States District Court, Southern District of New York | Testimony, Deposition | 2008 |
| Edward Volk v. Hank Malasky | Superior Court of the State of California, County of Marin | Testimony, Deposition, Trial | 2008 |

Expert opinion in this matter

I have been retained by counsel for the plaintiffs to respond to the claims of a class of former Target Corporation store executives and employees that they were discriminated against upon the basis of age. Accordingly, it is necessary to clarify the business model and operating environment of retailers, including Target's, as well as the patterns and practices that such retailers observe in managing their field and store operations.

Retailing is about defining a set of consumer needs and developing a merchandise and service offering to meet those needs better than anyone else in the market. Since the global retail market is highly competitive, this means that supply chain management and human resources management are key elements of successful retail strategy.

The objective of supply chain management is to achieve the lowest cost of ownership of all the merchandise, products and services used in the business. The objective of field and store operations management is to deliver a superior customer experience while controlling or minimizing human resource expense. The mission of any large retail company is to achieve a competitive return on capital employed ("ROCE") so that new capital can be raised for expansion purposes. Any particular merchandise inventory investment that does not contribute to achieving an adequate ROCE will be aggressively discontinued and replaced with something that can. Individual employees and classes of employees that can be replaced with lower cost or higher productivity employees will be identified for replacement. Always, it is the consumer, not the vendor or the retailer that determines whether a particular merchandise offering is successful or whether they will vote with their feet for the customer experience delivered.

On the supply chain side, the retailer is obliged (by competition) to be ruthless in making changes and negotiating new vendor terms. Vendors have little choice but to develop and source product from overseas markets where labor and benefit costs are substantially lower. Domestic jobs in manufacturing continue to be lost but the American consumer benefits from low cost, high quality merchandise.

On my professional website in the summer of 2006 I posted the following:

*"I love Target!" Most often heard at the pool this summer and most often from parents of young children. Fashion, fun, great prices and a satisfying shopping experience - "I can get two or three pairs of shoes for what I used to pay for one pair." Even the fearsome Wal-Mart goes comparison shopping at Target.*
*As we remember it, it was Gap Stores that pioneered private label product design and global sourcing to transform and improve the family's apparel shopping experience. Now the global supply chain has taken on a life of its own and retailers of all stripes must try and tame the beast – achieving the lowest cost of ownership and the highest quality of all of the products and services used in the business. Right now, Target is riding the wave.*

On the field and store operations side, the retailer is faced with the same competitive pressures but must be more circumspect in making wholesale cuts in labor expense. For each store format operated by a major retailer like Target, there will be one way of doing things. This permits the retailer to leverage investments in field management, facilities, technology and training. Trained staff can be moved from store to store or from district to district without confusion. Consumers will notice that, once inside a Target store, it is almost impossible to determine what town or state they are in.

It is my recollection that Target pioneered the concept of calling customers "guests" and employees "team members." Team members were trained and managed to deliver a superior customer experience to each store guest. A twenty year Target employee would have undergone continuous training, have worked hard at introducing new products and services, and have been asked to "believe" in the concepts of teamwork, leadership and loyalty to the Target brand. For such an employee, being told that the rules have changed and that they no longer fit the brand image would be a bitter blow.

Further, such an employee would find it difficult or impossible to protect themselves from age or long service discrimination because to do so requires questioning the company "brand."

The retailer (Target) is obligated to clearly delineate the terms and conditions of employment to new employees. The mechanism for doing this is the Team Member Handbook and a series of benefits manuals and training materials.

There are a number of reasons why Target Corporation wanted to lower the average age of its field and store operations management and staff:

1. A desire to raise the academic achievement level of management trainees – often referred to as a "best and brightest" hiring strategy. Target introduced a strategy of focused college recruiting and offered a faster track career path to these new employees.
2. Longer serving (older) employees are entitled to higher compensation and benefits but may not have higher productivity than more recent hires.
3. Health insurance costs are highly inflationary and older, longer term employees are more expensive to budget. There is pressure to reduce the number of hours of such employees so that they do not qualify for full benefits.
4. Pension plan costs grow and older, longer serving employees consume higher employer contributions. A federal age discrimination case (Mark Warpenburg v. Target) contained evidence that Target introduced a new pension plan that was less favorable to older, longer term employees. Target did allow all employees to opt into the new plan or stay with the old plan, but those that elected to stay with the old plan were statistically much more likely to be terminated.
5. In 2001, Gerald Storch, then Vice Chairman of Target, explained that the company faced three strategic choices – "to specialize, to become the low cost producer, or to differentiate (itself)." In order to differentiate itself, Target decided that the optimum customer experience or store "brand" should be fashionable, diverse and youthful. As a 2004 Harvard Business School article noted "The company (Target) has successfully associated its name with a younger, hipper, edgier and more fun image than its competitors." Older, longer term employees do not personally project this image or brand.

In my opinion, all of these factors are in play at Target. All of Target's brand messaging, including the merchandise presentation, new employee orientation materials, the Target.com web-site, its advertising and the annual report present youthful images. Depiction of the brand value added of

7

older, more experienced and more knowledgeable employees is virtually non-existent. The needs of older customers are not routinely addressed.

The leadership and management of a large company like Target requires a systematic (process oriented) approach to achieve continuous improvement in every aspect of the business. The Chief Executive must demand that every capital, expense and income line item be continuously reviewed and challenged in light of changing market conditions and business strategies. Gerald Storch, a former McKinsey management consultant, was Vice Chairman of Target from 2001 – 2005. Widely expected to replace Robert Ulrich as CEO, he left the company in October of 2005. It is likely that his influence on strategy and continuous improvement created an environment where age discrimination became inevitable.

A decision process that encouraged young energetic people to join the company while raising productivity per labor dollar inevitably resulted in age discrimination. Those individuals who had invested in their career path with loyalty and hard work but who were not regarded as "hi-po's" (high potential) or high productivity superstars were forced out. Their experience value added was offset against the savings from hiring younger less experienced employees. Line management had been trained to believe in the company's mission and values. To clean out the older, longer serving employees, line management had to game against the old rules and values using code words, encouraging older employees to leave with a "nod and wink." Naturally, no fair record of this cleansing process was maintained. Deposition testimony from current and former target employees is replete with these code words and phrases such as "blockers," "grey hair," "bright eyed," "speed is life," Target brand" and "fast, fun and friendly."

The rights of long term, older employees in senior management are protected by employee contracts. Target management took few, if any, steps to reassure older long tenure field and store operations employees that they would be treated fairly and have proper recourse if they had concerns about their career security. This resulted in additional stress and anxiety because they were not given practical guidelines for improving their chances for continued employment and career advancement. They were set up to fail and denied a fair "day in court" to argue their own case.

I have read and reviewed the depositions of about 50 former Target Region 300 employees who testified that they experienced age discrimination. In my opinion, their stories are compelling and evidence of actual age discrimination at Target.

The absence of any meaningful written prohibition of age discrimination in the policies and procedures that were employed by Target human resources management or any meaningful appeal or review process that could be accessed by these ex-employees allowed age discrimination to take place. Victims of gender or racial discrimination may have had legal support from the company but victims of age discrimination were on their own. In his deposition, Develle Turner, Director of Diversity for Target, confirmed that diversity guidelines encompassed race/national origin and gender but not generational diversity. Many older terminated employees were encouraged not to pursue their complaints in return for a separation package agreement and a requirement of confidentiality.

8

In summary, my expert opinion is as follows:

Target Corporation engaged in a highly successful strategy to market to younger demographic customers while controlling expenses and increasing earnings. This strategic emphasis resulted in pressure to hire more younger employees and to reduce the number of older, longer serving employees. Executives who were charged with achieving continuous improvement in financial budgets and profit plans responded to the pressure and found ways to displace the older workers. In the absence of legal and management oversight, older employees were discriminated against on the basis of age and forced out of the company.

Robert Bartlett

Bartlett Joseph Associates
51 Gable Court
San Rafael, CA 94903

Tel (415) 499-8660
Fax (415) 479-3970
Web bjaretailconsultants.com